Nott, J.,
delivered tlie opinion of the court:
This is an action brought by the State of Indiana to recover certain proceeds of the public lands pledged and set apart for its benefit, as is alleged, by the organic act for its admission to the Union. The facts are chiefly facts of which the court can take judicial notice, excepting the amounts of certain receipts, payments, and expenditures, and those amounts are practically undisputed, being shown by the accounts of the Land Office and Treasury Department. The questions in the case, therefore, are substantially questions of law, and they will be better understood by segregating them within certain chronological periods.
1. The first period extends from the admission of Ohio in 1802 to the admission of Indiana in 1816.
The Act 30th April, 1802 (2 Stat.. L., p. 173, § 7), to enable the people of Ohio to form a constitution and State government and for the admission of such State into the Union, contained the following provision:
“ That the following propositions be, and the same are hereby offered to the convention of the eastern State of the said territory, when formed, for their free acceptance or rejection, which, if accepted by the convention, shall be obligatory upon the United States. * * * Third. That one-twentieth part of the net proceeds of the lands lying within the said State sold by Congress, from and after the thirtieth day of June next, after deducting all expenses incident to the same, shall be applied to the laying out and making public roads, leading from the navigable waters emptying into the Atlantic, to the Ohio, to the said State, and through the same, such roads to be laid out under the authority of Congress, with the consent of the several States through which the road shall pass: Provided always, That the three foregoing propositions herein offered-, are on the conditions that the convention of the said State shall provide, by an ordinance irrevocable, without the consent of the United States, that every and each tract of land sold by Congress, from and after the thirtieth day of June next, shall be and remain exempt from any tax laid by order or under authority of the State, whether for State, county, township or any other purpose whatever, for the term of five years from and after the day of sale (section 7).”
This proposition was accepted by the convention of Ohio, and the State entered the Union, having thus given and received the prescribed pledge. The next year this “one-twentieth part,” or five per cent, of the net proceeds of lands which *598 might be sold within the State was divided; three per cent of the proceeds was to be paid directly to the State, to be, however, applied to the laying out, opening, and making of roads within its borders (Act 2d March, 1803,2 Stat. L., p. 225). From that time on the “one-twentieth part” of the proceeds remained thus divided, and these two divisions of it have been familiarly known as the “ 3 per cent fund ” and the “ 2 per cent fund ; ” the former being disbursed by the State, the latter remaining in the custody and under the control of the General Government.
In 1806 Congress passed an act for the building of the National Eoad from Cumberland to the Ohio through the States-of Maryland, Pennsylvania, and Virginia (Act 2ith March, 1806,2 Stat. L., 357). Thirty thousand dollars was appropriated, to be paid out of the 2 per cent fund, or, if that was not sufficient, out of any money.in the Treasury not otherwise appropriated. But to the latter alternative was attached the condition that money paid out of the public funds should be reimbursed out of the 2 per cent fund as it might accrue. At the time of this $30,000 appropriation there was in the Treasury to the credit of the 2 per cent fund $12,652.
In 1808 the ( instruction of the road was begun, and between that time and the admission of the State of Indiana there was appropriated for that purpose, including the $30,000 previously appropriated, $710,000, as shown by the following table:
Act of Marcli 24,1806 (vol. n, Stat. L.). $30,000
Act of February 14, 1810 (vol. n, Stat. L., p. 555). 60, 000
Act of Marcia 3, 1811 (vol. n, Stat. L., p. (¡61). 50,000
Act of May 6, 1812 (vol. n, Stat. L., p. 730) . 30, UOO
Act of March 3, 1813 (vol. n, Stat. L., p. 829). 140,000
Act of February 14, 1815 (vol. ni, Stat. L., p. 20G). 100,000
Act of April 16) 1816 (vol m, Stat. L., p.282;. 300,000-
Total. 710,000
All of these appropriations were for the building of a road to the State of Ohio, and every act provided in substance that money paid out of the public funds should be reimbursed from the 2 per cent fund.
At this time the expenditures upon the National Boad were largely in excess of the moneys credited to the 2 per cent fund, which in 1825 amounted to only $200,000. Such was the condition of affairs when Congress passed the act_ for the admission of Indiana to the Union.
*599 2. The second period extends from the admission of Indiana, in 1816, to the abandonment of the National Road in 1835.
The act for the admission of Indiana to the Union, the Act lWi April, 1816 (3 Stat. L., p. 289), like the Ohio act, proffers to the State the one-twentieth part of the proceeds of the public lands, and upon the same condition, that lands sold by the United States should be exempt from State taxation for a period of five years. The proposition differs from that of the Ohio acts, 1802, 1803, in only one particular, that it does not refer to “ navigable.waters emptying into the Atlantic” as the eastern terminus of the road, but simply declares that two-fifths of the one-twentieth part, that is-to say, the 2 per cent fund, “ shall be reserved ” and applied “ to the making of a road or roads leading to said State under the direction of Congress.” The language of the act is as follows:
“ Third. That 5 per cent of the net proceeds of the lands lying within said Territory, whicn shall be sold by Congress from and after the 1st day of December next, after deducting all expenses incident to the same, shall be rese'ved for the making of public roads and canals, of which three-fifths shall be applied to those objects within the said State, under the direction of the legislature thereof and two-fifths to the making of a road or roads leading to said State, under the direction of Congress.
‘‘Fourth. That one entire township which shall be designated by the President of the United States, in addition to the one heretofore reserved * * * for the use of a seminary of learning, * * * to be appropriated solely to the use of such seminary by the said legislature.
“Fifth. That four sections of land be * * * granted to the said State, for the purpose of fixing their seat of government thereon, which four sections shall * * * be located at any time, in such township and range, as the legislature aforesaid may select.
“That the five foregoing provisions, herein offered, are on conditions that the convention of said State shall provide by ordinance irrevocable, without the consent of the United Stages, that every and each tract of land sold by the United States, from and after the 1st day of December next, shall be and remain exempt from any tax, laid by order or under any authority of the State, whether for State, county, or township, or any other purposes whatever, for the term of five years, from and ■ after the day of sale.”.
*600 Subsequent to tbe admission of Indiana tbe States of Illinois, Missouri, Alabama, and Mississippi came into tbe Union, and each State entered into an agreement with regard to tbe public lands that might be sold within its territory which was identical in terms with the foregoing statute so far as it relates to the two per cent fund; and indeed the only variation in the disposition of the “ one-twentieth part ” of the proceeds of the public lands was that in the State of Illinois the three per cent fund was to be applied to the encouragement of learning within the State instead of to the making of roads. * In 1818 Congress appropriated money for completing the National Eoad between Cumberland and Wheeling (Act 14th April, 1818, 3 Stat. L., p. 42G), and in 1820 began a series of enactments and appropriations for tbe construction o fthe road from the Oliio to the Mississippi through the States of Ohio, Indiana, and Illinois (Act 15th May, 1820, 3 Stat. L., 604). These acts are thus analyzed by the counsel for the State of Illinois, Mr. Howard, in another case:
“After the admission of Missouri the appropriations are limited and restricted in different and curious manners. Commencing with the act of March 3, 1825, and going on regularly, March 25,1826, March 2, 1827, March 19,1828, Maxell 2, 1829 (two acts), and May 31,1830, the provisions are that the moneys shall be replaced out of the two per cent funds of Ohio, Indiana, Illinois, and Missouri. Then follows a series of acts, viz, March 2, 1831, March 3,1832, June 24, 1831, March 3, 1835, in which the moneys are to be replaced out of the reserved funds of Ohio, Indiana, and Illinois, not mentioning Missouri. Then on July 2,1830, the moneys were to be replaced out of the reserved funds of the four States, including Missouri again. Then come the last acts, March 3, 1837, and May 25, 1838, which provide that the several sums appropriated should be replaced by the States, respectively, out of the fund reserved for each. We have thus live kinds of appropriations — first, generally out of moneys in the Treasury not otherwise appropriated ; second, charged to the State of Ohio fund; third, charged to the fund ol the States of Ohio, Indiana, and Illinois; fourth, charged to the fund of Ohio, Indiana, Illinois, and Missouri; filth, charged to the fund of the State in which work was done. Some of these come within the terms of the original compacts; some do not.”
In 1822 the road had been finished from Cumberland to Wheeling, 132 miles, at a cost of nearly $20,000 a mile, and was in process ot construction through the State of Ohio. *601 Congress were then face to face with the fact that a great highway, covered by endless wagon trains, which passed over it ceaselessly day and night, required superintendence, repairs, and constant expenditures. Tbe public at large were unwilling to maintain at what was then deemed great expense a free road for the benefit of a few States. The remedy of the time was to impose tolls upon the traffic of a road. Accordingly a bill passed both Houses for the erection of tollgates and the imposition of tolls, but it was vetoed by President Monroe, because he doubted the constitutional power of Congress to impose tolls within the territory of a State.
The action of the President left the Government and people •of the United States in the unpleasant position of owning a road (with the consent of the several States through which it ran) upon which they could constitutionally expend money to any amount, but from which they could not constitutionally derive anything. Notwithstanding this constitutional light upon the subject, the people at large were not willing to continue the policy of expenditure, aiid a policy of abandonment necessarily set in.
That policy gradually took form and effect in the provisions of numerous statutes, the general purpose of which was that the Government should complete the National Road from the Ohio to the capital of Missouri, but that as fast as completed it should be surrendered to the States through whi. h it ran. The following are the statutes referred to:
Act of March 2, 1829 (vol. IV, stat. L., pp. 351, 352).
Act of March 3, 1829 (vol. iv, stat. L., pp. 363, 364).
Act of May 31, 1830 (vol. IV, stat. L., pp. 427, 428).
Act of March 2, 1831 (vol. iv, stat. L., p. 469).
Act of March 2, 1831 vol. iv, stat.L., pp. 483,486).
Act of March 2, 1833 (vol. iv, stat. L., p. 605).
Act ol June 24, 1835 (vol, IV, stat-. L., pp. 680,681).
Act of March 3, 1835 (vol. IV, stat. L., p. 772).
Act amendatory (vol. IV, stat. 1.., p.772).
Act of July 2, 1836 vol. v, stat. L., pp. 71, 72).
Act of March 3, 1837 (vol. v, stat. L., pp. 195, 196).
Act of May 25, 1838 (vol. v, stat. L., p. 228).
Act of September 4, 1841 (vol. v, stat. L., p.457).
Act of August 11, 1848 (vol. ix, stat. L., p. 283).
Act of January 20, 1853 (vol. x, stat. L., p. 152).
Act of May 9, 1856 (vol. XI, stat. L., p. 7).
But so far as the present cause of action is involved, which relates to the supposed obligation of the Government to build a road “leading to said State” of Indiana, it is sufficient to *602 say that before such a road was completed Congress, by the Act 2d March, 1831 (4 Stat. L., pp. 483, 486), authorized the State of Ohio to assume control of a portion of it and to erect toll gates thereon, and by the Act 2d March, 1833 (ib., p. 655), granted similar powers to the State of Virginia; that, on the completion of the road in the States of Maryland, Pennsylvania, and Virginia, Congress surrendered it to those States by the Act 2Uh June, 1834 (ib., p. 680); and that by the Act 3d March, 1835 (ib., p. 772), appropriations were provided for the completion of the road in the States of Ohio, Indiana, and Illinois, and for repairs on the road east of the Ohio, but the act forbade that the money so appropriated for repairs should be expended until the road east of the Ohio had been surrendered to and accepted by the States through which it passes.
Finally, it is to be said that the appropriations continued after the recessions to the different States until the road was completed across the State of Ohio and to the State of Indiana; that it was not equal in construction or quality to the road east of the Ohio, but nevertheless had been graded, bridged, and made a public highway; and that its cost exceeded all of the moneys which the Government has received from the 2 per cent funds of all the States which have thus contributed to its construction.
3. The third period extends from the abandonment of the National Koad as a national work, in 1831,1833, and 1835, to the final legislation of Congress in regard to the 2 per cent. fund.
There are but three acts of Congress in this period which can affect the rights of the present claimant. The first of these is the Act Ath September, 1841 (5 Stat. L., p. 453, §§ 1, 16, 17), ‘■‘An act to appropriate the proceeds of the sales of the public lands, and to grant preemption rights.” It provides for the distribution of the proceeds of the public lands among the States and Territories of the Union, with a special reservation in favor of some of them, among which is Indiana, but nevertheless with this proviso:
“ That the sum so allowed to the said States, respectively, shall be in nowise affected or diminished on account of any sums which have been heretofore, or shall be hereafter, applied to the construction or continuance of the Cumberland Koad, but that the disbursements for the said road shall remain, as heretofore, chargeable onthe two per centum fund provided for by compacts with several of the said States.”
*603 After many other provisions of a general nature the statute proceeds to deal specially with the cases of Alabama and Mississippi by the following enactments:
“Sec. 16. And be it further enacted, That the two per cent, of the net proceeds of the land sold, or that may hereafter be sold, by the United States in the State of Mississippi, since the first day of December, eighteen hundred and seventeen, and by the act entitled ‘An act to enable the people of the western part of the Mississippi Territory to form a constitution and State government, and for the admission of such State into the Union on an equal footing with the original States,’ and all acts supplemental thereto reserved for the making of a road or roads leading to said State, be, and the same is hereby relinquished to the State of Mississippi, payable in two equal installments; the first to be paid on the first of May, eighteen hundred and forty-two, and the other on the first of May, eighteen hundred and forty-three, so far as the same may then have accrued, and quarterly, as the same may accrue, after said period : Provided, That the legislature of said State shall first pass an a.ct, declaring their acceptance of said relinquishment in full of said fund, accrued and accruing, and also embracing a provision, to be unalterable without the consent of Congress, that the whole of said two per cent, fund shall be faithfully applied to the construction of a railroad, leading from Brandon, in the State of Mississippi, to the eastern boundary of said State, in the direction, as near as may be, of the towns of trelma, Cahaba, and Montgomery, in the State of Alabama.
“Seo. 17. And be it further enacted, That the two per cent, of the. net proceeds of the lands sold by the United States, in the State of Alabama, since the first day of September, eighteen hundred and nineteen, and reserved by the act. entitled ‘An act to enable the people of the Alabama Territory to form a constitution and State government and for the admission of such State into the Union on an equal footing with the original States,’ for the making of a road or roads leading to the said State, be, and the same is hereby, relinquished to the said State of Alabama, payable in two equal installments, the first to be paid on the first day of May, eighteen hundred and forty-two, and the other ou the first day of May, eighteen hundred and forty-three, so far as the same may then have accrued, and quarterly, as the same may thereafter accrue: Provided, That the legislature of said State shall first pass an act, declaring their acceptance of said relinquishment, and also embracing a provision, to be unalterable without the consent of Congress, that the whole of said two per cent, fund shall be faithfully applied, under the direction of the legislature of Alabama, to the connection, by some means of internal improvement, of the *604 navigable waters of the bay of Mobile with the Tennessee River, and to the construction of a continuous line of internal improvements from a point on the Chattahoochee River, oppositeWest Point, in Georgia, across the State of Alabama, iñ a direction to Jackson in the State of Mississippi.”
The second statute in this period is the Act 2d March, 1855 (10 Stat. L., p. 630), which directs the Commissioner of the Land Office to state an account of the one-twentieth part or five per cent, fund with the State of Alabama, and requires him to include in it the lauds appropriated for Indian reservations.
The.third and last statute is the Act 2d March, 1857 (11 Stat. L., p. 20.0), which directs the Commissioner to state an account with the State of Mississippi “ upon the same principles of allowances and settlement,” and also (by a subsequent section) to state an account with “ each of the other States upon the same principles’1'1 and “ allow and pay to each State such amount as shall thus he found due, estimating all lands and permanent reservations at $1.25 per acre?
TJnder the statute last cited the Commissioner of the General Land Office stated an account in 1872 and allowed a balance of $0,380.85, which was paid to the claimant. But it is proper to add that the claimant did not accept that amount as a final settlement, and that the Comptroller of the Treasury, when admitting and certifying the balance allowed by the Commissioner, expressly “ reserved for future consideration ” the questions which are now presented by this suit. In 1889 the governor of Indiana made a formal demand upon the Commissioner to state an account in accordance with the Act 1857, but the Commissioner has rested upon the account previously stated. Many other statutes and proceedings and facts were cited or adverted to by counsel on one side or the other in the progress of the argument, but in the view of the case taken by the court, the foregoing, it is believed, are all which bear directly upon the questions to be decided.
The position inatained by the counsel for the claimant, as understood by the court, may be summarized in the following propositions:
(1) That the two per cent fund created by the Indiana Act, 1816, was irrevocably pledged to an expressed purpose, and the purpose could not be modified or abandoned without the consent of the State.
*605 (2) That tbe release from State taxation of lands which the Government might thereafter sell constituted a goo 1 and valuable consideration.
(3) That the Indiana Act must be read in pari materia with tbe Ohio Act, and so read they bound the Government to construct a road from navigable waters on the Atlantic coast to the State line, and of the quality and excellence precribed by law for the road then in process of construction.
(4) That such a road has never been constructed, Cumberland, the eastern terminus not being on navigable waters, and the road west of the Ohio not coming up to the standard prescribed by law for the section between Cumberland and Wheeling.
(5) That the abandonment of the road as a natural highway, its surrender to the several States through which it passes, and the permission given to some of the States to erect tollgates and exact tolls constituted a breach of the compact, rendering the Government liable to the State for all of the moneys reserved for the two per cent fund.
And, finally, that the Act 1857 was intended to accomplish this restitution, or at least to operate retroactively so far as to place “ the other States ” on a footing with Alabama and Mississippi as effectually as if they had been included in the Act 1841, at the same time, in effect, creating a trust, which relieved the claim from the operation of the statute of limitations. These positions have been maintained with great ability, not only by the learned counsel in this case, but by the counsel in the kindred cases of Ohio and Illinois, and they have been fortified by a comprehensive review of many statutes and decisions, of many legislative resolutions and reports, and the opinions of eminent statesmen and well-known lawyers and jurists.
But the position of the claimant will perhaps be more accurately and tersely defined by an extract from the petition:
“ The defendant agreed to pay your petitioner 3 per cent of the 5 per eent of the net proceeds of the sale of lands, and to expend the remaining 2 per cent, thereof in the making of a road or roads leading to the said State, under the direction of Congress.”
*606 And by an extract from tbe claimant’s proposed findings of fact:
“The 5 per cent fund was the property of the individual States, and Congress but the trustee to direct the expenditure of two parts of it to an express object — ‘ the making of a public road leading to the State’ of Indiana.”
And by an extract from the opinion of an eminent lawyer, Ex-Attorney-General Cushing:
“Itis plain to see that Congress, by enacting the laws in question, did, in effect, as we have previously shown, solemnly recognize and proclaim its abandonment of all claim to these trust funds, and the surrender thereof to the respective States.”
The first question which the court designs to consider is the responsibility of the Government under the Act 3816, audits consequent liability to the claimant at the time when the Act 1857 was passed. In this inquiry we shall assume that the claiiflaint’s position is correct; that the ‘2 per cent fund “ was the property of the individual States, and Congress but the trustee to direct the expenditure.”
Conceding substantially all of the minor positions taken by the claimant; conceding that the Act 1816 created an irrevocable compact, obligatory upon the Government, and supported by a good and valid consideration ; conceding that the road contemplated was to run from navigable waters on the Atlantic coast, and that Cumberland was not a proper terminus within the intent of the compact; conceding that the Government abandoned the undertaking before completion, and surrendered the unfinished road to the different States in which it was situated, and authorized them to assume the management of it, and impose tolls upon interstate traffic over it; conceding all of these things, it does not follow that there was such a perversion of the trust as to make the Government liable for the moneys which it received or to entitle the State to recover them to its own use.
The Government did not agree, through the medium of these statutes, to build and complete a road from one point to another at its own cost and charge in consideration of the renunciation of taxation and of the moneys reserved from the sales of public lands. If there had been such an agreement there would have been no trust. The compact would have been a *607 simple contract to do a specific thing for a specific consideration, and the amount which one contracting party might acquire from the sales of its own lands would not concern the other. If there be a trust in this case, it is simply to receive and disburse the money of the other party; i. e., the money of the ces-tui que trust; and if there be any responsibility attached to such a trust, it is merely to disburse the money in reasonable time, honestly, disinterestedly, and for the declared purposes of the trust.
If the Government by the Act 1816 agreed to do more than this — if it agreed for a valuable consideration to do a specific thing and did not, its failure to perform was a plain breach of contract, and the claimant in 1857 was only a contractor, seeking damages for the breach. What, then, was it that the Government agreed to do? It agreed that “ five per cent of the net proceeds of the lands lying within the said territory” should be “ reserved,” and that much of the agreement has confessedly been performed. It agreed that three-fifths of this five per cent should be paid to the State, and that obligation has been discharged. It also agreed thattwo-fifths should be u applied to the malting of a road,” and if there be any trust it is in the application of that money to that purpose.
That purpose was a public highway which should connect certain of the inland States with the Atlantic seaboard. Manifestly such a road could not be begun and finished by one operation from end to end. Manifestly there had to be a beginning long before there could be a completion. In the absence of specific instructions in the terms of a trust, to say nothing of the provision that this should be done “ under the direction of Congress, ” the trustee would be invested with all needful discretion. Whether the road should be begun at the eastern terminus and built westward, whether it should be begun at the western terminus and built eastward, or whether it should be built by intermediate sections where it was most needed, were questions iuevitably involving discretion, and upon which the discretion of a trustee could be properly exercised.
All that a trustee would be bound to do in such a case would be to expend the trust fund without unreasonable delay, according to his best judgment, for the good of the cestui que trust, Cumberland may not have been a proper terminus for the Na *608 tional Road within ilie intent of the trust as defined in the Ohio Act (1802), but the section between Cumberland and Wheeling certainly was within the contemplation of the statute, and if it absorbed all of the trust fund properly applicable thereto, assuredly that discharged the trustee. Not until it appears that the Government has. money in its Treasury which should have been “applied” to the object of the trust, or until it appears that its expenditures of the fund were a perversion of the trust, can it be held accountable as a trustee. A trustee can not be held responsible because a trust fails to accomplish all that was hoped or promised.
The court can perceive no perversion of the trust in the manner in which the National Road was laid out; and, on the contrary, the manner in which the work was prosecuted through the States of Maryland, Yirginia, and Ohio, so far as the facts are known to the court, seems to have been a sound exercise of a reasonable discretion.
Neither can the court regard the methods adopted for maintaining the road after it was constructed by its surrender to to the different States through which it passed as an illegal abandonment of the trust, negativing everything that had been done, and rendering the Government liable for everything that if had received.
The statutes which contemplated the construction of a national road did not provide for its maintenance after its completion. They may have created a trust founded upon a valuable consideration, but they certainly did not require the trustee to maintain a free road at its own, the trustee’s, cost. The funds derived from the sale of public lands in Indiana and other designated States merely contributed toward the cost of building the road: yet, if it had been built wholly by those funds, the discretion would still have remained in Congress of determining whether it was so far national, was so much for the general welfare, that it should be kept free at the public expense, or whether it should be maintained, as most thoroughfares were at that day, by imposing tolls upon those who used it.
If the road had been built entirely out of these so-called trust funds, and Congress had then sold it to the highest bidder for more than ithad cost, the trustee makingmouey out of the trust, and had authorized that bidder in turn to charge exorbitant *609 tolls and make more money out of it, a question would be presented wbicli is not now involved. Here the trustee made nothing out of the trust; the road to be useful had to he maintained; there was no fund wherewith to maintain it; there was no obligation to maintain a free road'; the cost of keeping a much-traveled road in order was well known to be a large percentage of its prime cost, and Congress assuredly, without a breach of faith, might make the proper State governments the custodians of the road and authorize them to maintain it by the customary expedient of imposing tolls.
Neither can the court regard the appropriations for the National Road as an inoperative application of the trust funds to their legitimate object. A trustee in such a case would not be bound to keep the trust moneys in a separate parcel and pay them out eo nomine as he received them; the advancing of money before it was received was no injury to the cestui que trtist nor advantage to the trustee;-and the directions in the appropriation acts that this appropriation and that appropriation be paid out of any money not otherwise appropriated, but be charged as a payment on account of the 2 per cent fund, was a mere matter of bookkeeping. As legislation, the appropriation acts expressed the legislative intent that the avails of the public lands — the 2 per cent fund — should be applied to that object and in that way. The object was avowedly the one for which the trust, if any, was created; the method was one which could not injure the cestui que trust nor benefit the trustee, and which effected the purpose of the trust in the most direct manner. Whether there are still funds in the Treasury derived from the sales of public lands in Indiana which have not been applied to the object of the trust is another question, which will now be considered.
The Government, as has been said, was not bound to build the National Road out of public funds, and can not be deemed to have misapplied the moneys which it received in trust by the methods of construction and maintenance which it adopted; but, at the same time, a trustee can not throw half a dozen trusts into hodge podge and set up a general defense against his liability in each. The object here was a common one — the building of a road; but not altogether a common one, for a State was only interested in the application of the 2 per cent fund toward a road east of its own boundary line, and was not *610 responsible for what bad been built or done before it entered the Union. The compact with the Government was prospective, not retroactive, that the 2 per- cent fund should thereafter be 11 applied” 11 to the malcing of a road.” Each State was entitled to have all of its 2 per cent fund invested in the road, irrespective of what others were doing or had done; and if the Government mingled the trust funds, each State is entitled now, under the Act 1857, to its due proportion of whatever balance may remain unexpended. The Government could not receive $100,000 from Ohio, $100,000 from Indiana, and $100,000 from Illinois without expending $300,000 on the road. From 1802 to 1816 Ohio had been the only party to the arrangement, and during that period the Government had expended much more upon the road than it had received from the sale of lands within the State; but the moneys received from Indiana lands can not now be applied upon that deficiency. The State of Indiana was entitled to have all of the 2 per cent fund derived from lands within its borders expended, not for the payment of old debts or the making good of an overdrawn account, but for the construction of a road! The account to be stated must begin when that State entered the Union.
From the time when Ohio and Indiana became joint contributors to the common object, the question for an accountant is whether the joint contributions exceeded the expenditures of the Government. As each new State came into the arrangement, its contributions, would in like manner swell the responsibility of the Government and be taken into the account until the road reached the State line, i. e., until a road was made “ leading to the said State.” Then the account so far as Indiana was concerned would stop, and the road constructed westward of its eastern line would be chargeable only to the States toward which it led. Chronologically the account must open when a State entered the Union, geographically it must close when the road arrived at its boundary line. Such an account will involve an accounting with all the States; for while the Government has advanced much more than it has received, yet nevertheless it is possible that there is one or more States whose 2 per cent fund was larger than the expenditures properly chargeable to it.
No such account was presented by either party upon the argument, and it is too involved to be framed by the court *611 from an inspection of tbe statements of tbe Land Office; but at tbe same time tbe court must infer, from tbe concessions of counsel and tbe returns of tbe Land Office and Treasury Department, that tbe expenditures exceeded tbe receipts in all cases, and that if a proper account were made up no surplus would appear in which tbe State of Indiana would be entitled to participate by virtue of the original trust as defined in tbe organic act.
The ultimate question before tbe court, accordingly, is whether tbe State of Indiana acquired a new right to these proceeds of tbe public lands by virtue of tbe final legislation of Congress ; or, stated more specifically, whether tbe intent of tbe Act 1857 was, that an account should be stated de novo, in which all of tbe credits to tbe State from tbe 2 per cent fund should remain, and all of tbe debits for expenditures made by direction of tbe various appropriation acts be expunged ?
There is no obligation in the case, moral, legal, or equitable, leading tbe court toward this as tbe true intent of the legislative action. Tbe government bad done all that it bad agreed to do and more; and bad tbe right to continue to apply tbe 2 per cent moneys upon its own advances until it should fully reimburse itself. But Congress also had the power to wind up this business of road-building, to close tbe account, to carry tbe deficit to profit and loss, and relinquish tbe diminished avails of tbe public lands to tbe States directly interested in them, or to make a gift of all that bad been received since the States entered tbe Union without an obligation legal or equitable to do so. Whether tbe relinquishment should date from one day or another, from 1816 or from 1857, was equally within tbe power of Congress, and alone by Congress could be determined.
Tbe first renunciation by tbe Government of its right to control and disburse the 2 per cent fund was by tbe Act September 4, 1841 (5 Stat. L., p. 4.53, §§ 16,17). The counsel for tbe United States has contended that this was not a relinquishment of the fund to tbe States named in the act in their own right, but that they were merely substituted as custodians of tbe fund upon certain conditions, which were that they should agree to expend it in designated improvements of a public nature. This is conceded, but it is averred in reply, that nevertheless the Government relinquished its right to repayment of advances from that fund and that the relinquishment was irrev *612 ocable. The relinquishment, however, was only to the States of Alabama and Mississippi, and the statute did not extend directly or by implication to the other States. There may have been reasons why this favor should have been extended exclusively to those two States, such as their greater need, that they had received less benefit from the public expenditures than the other States, and the like, and such reasons can not be questioned here; they are legislative, not judicial.
In 1855 a dispute apparently had arisen between the State of Alabama and the General Land Office as to the proceeds of the public lands; and it appeared that the Govern ment, instead of selling all of the public lands within that State, had appropriated portions of them to its own uses and purposes by ceding them as Indian reservations. Accordingly the Act 2d March, 1855“(10 Stat. L., p. 630) was passed, which required the Commissioner of the Land Office to state an account between the Government and the State of Alabama, and uto include in said account the several reservations under the various treaties with the Ohickasaws, Ohoctaws, and Greek Indians within the limits of Alabama.” No “ principle” for stating such an account is prescribed by the act, unless it be the declaration that Indian reservations shall be regarded as sales and credited to the State in the account.
Such was the state of the case when the final statute was passed, the Act 3d March, 1857 (11 Stat. L., p. 200). Its primary purpose was to extend to the State of Mississippi the additional favor which had been extended to Alabama by the statute of the preceding Congress. So far it was clear and consistent, for Alabama and Mississippi stood upon precisely the same footing under the Act 1841, and in the tact that large quantities of the public lands within their territorial limits had been ceded to the Chickasaw and Choctaw Indians. The first section of the act accordingly provided :
“That the Commissioner of the General Land Office be and he is hereby required to state an account between the United States and the State of Mississippi, for the purpose of ascertaining what sum or sums of money are due to said State, heretofore unsettled, on account of the public lands in said State, and upon the same principles of allowance and settlement as prescribed in the “Act to settle certain accounts between the United States and the State of Alabama,” approved the 2d March, 1855; and that he be required to include in said account the several *613 reservations under the various treaties with the Chickasaw and Choctaw Indians within the limits of Mississippi, and allow and pay to said State 5 per centum thereon, as in case of other sales, estimating the lands at the value of one dollar and tweuty-ñve cents per acre.”
JBnt the words uand other States” were added to the title, and a second section was appended to the enactment. It is in these words:
“ Sec. 2. And be it further enacted, That the said Commissioner shall also state an account between the United States and each of the other States upon the same principles, and shall allow and pay to each State such amount as shall thus be found due, estimating all lands and permanent reservations at one dollar and twenty-five cents per acre.”
This second section, therefore, in the use of the words “upon the same principles,” refers to the first, and the first in the same manner refers to the Act 1855; and the Act 1855 specifies no “principle” for the statement of an account other than that the reservations ceded to Indians should become an item of credit to the State; and neither statute indicates an intent to prescribe any other change in the account, or to create a new liability on the part of the United States by revoking all the charges for moneys advanced which had been expressly ordered, not by the Laud Office or the accounting officers, but by nearly all the appropriation acts authorizing expenditures upon the National Hoad.
Having thus directed the Commissioner of the Land Office to state an account and instructed him as to the principle upon which he should proceed, the Act 1857 commands “ and [he] shall allow and pay to each State such amount as shall thus be found due.” Finally, it adds to the foregoing instruction and mandate another, “ estimating all lands and permanent reservations [instead of reservations for the Chickasaw and Choctaw Indians] atone dollar and twenty-fire cents per acre.”
Up to this time the States referred to as “ each of the other States” had had no legal right to an accounting; for the administration of the fund rested exclusively with the Government, and these States were not entitled to recover or receive the money which such an accounting might show to the credit of the fund still unexpended for the purposes of the trust.
• The Act. 1857, therefore, seems to the court to have accomplished three things: 1st, by directing the Commissioner of the *614 Land Office to state an account it provided a remedy, such as it was, for the several States, which, moreover, was the only remedy within their reach, this court not then having power to adjudicate claims; 2d, it created a new liability on the part of the Government, by making the permanent reservation of the public lands equivalent to a sale, and the Government a purchaser at the usual price per acre; 3d, it created a new or statutory right of action, by making the cestui que trust a beneficiary at law, in authorizing the States to receive directly the money which theretofore had been held in trust for their benefit.
It is not thought by the court that this statute did more, or that it could have been intended to do more. Tbe advantages which the States of Alabama and Mississippi acquired over “the other States” was not by virtue of the Act 1857, nor by virtue of the Act 1855, but by virtue of the Act 1841, which changed the relations of the parties and substituted those States as trustee, giving them a legal right to the custody of the fund under certain specified conditions, which have never been extended to the other States.
There is no “ principle” indicated in the Act 1855 which could possibly operate upon such expenditures for the National Eoad as had become charges against the 2 per centfund under the authority of the appropriation acts. The sole benefit which the beneficiary, the State of Alabama, acquired by virtue of that statute was a credit for the lands taken for Indian reservations. The same thing is true of the Act 1857 when applied to the State of Mississippi. That State derived no benefit from that statute beyond the credited item of Indian lands. It therefore seems impossible that the “ principle ” which gave nothing to Alabama and Mississippi but a new item of credit for Indian reservations, could confer, when extended to “ the other States,” another and distinct benefit upon them, and, by r^:ro-active operation, practically work a repeal of all the legislation which had made the appropriations for the National Eoad a charge upon the 2 per cent fund.
If it was so intended by Congress, there should have been added to the second section the words, “And the Commissioner shall also allow and pay to each State two per cent of the net proceeds of the public lands since such State entered the. Union, notwithstanding the various provisions of law which *615 direct that snob two per cent shall be applied to the construction of the National Boad or to the reimbursement of the Government for moneys advanced for that project.” The judiciary can not import such a provision into a statute by inference or interpretation. To state an account implies a statement of debits and credits. To command a public officer “ to state an account” and pay “such amount as shall thus he found due,” is a very different thing from making a gift to the other party ex gratia of all the moneys that happen to appear on one side of it.
As it is'possible that a balance may be due to the claimant on a proper accounting, we proceed to the consideration of a question which has been elaborately argued, the question of the statute of limitations.
As has been said, the only remedy which the States possessed in 1857 was the authority conferred on the Commissioner of the General Land Office to state an account and pay over the balance which he might find to be due. In 1863 Congress provided another remedy, an action in this court. If the accounting of the Commissioner of the Land Office was not essential, or a prerequisite to a right of action, the claim accrued as soon as the Act 1857 was- passed, and accruing then, necessarily became barred by the statute of limitations on the 3d March, 18(56 (12 Stat. L., p. 765, § 10). If, on the contrary, the accounting of the Commissioner was a prerequisite to an action in this court, and no claim existed on which an action could be brought until his account was stated, and he load.11 allowed” and •“ found due” a certain “ amount,” .then, from the nature of things, his proceeding was judicial, and his jurisdiction exclusive, and the “ amount ” which he might “ allow ” was an award, and the only action which could be maintained would be an action upon it for the “ amount” u found due.”
Either of these alternatives is fatal to the claimant’s case, if that case rests on the Act 1857. The trust was then at an end; the State of Indiana was then authorized and empowered to act on its own behalf and in its own right; a new cause of action was then created and a newright of action given. We can perceive no reason why the action could not have been brought as well in 1861 as in 1889, unless it be the reason that the court did not have jurisdiction of the claim; and if the court did not then have jurisdiction of the claim, it was be *616 'cause an exclusive jurisdiction was vested in tbe Commissioner of the Land Office.
In the earlier part of this decision we have considered the case as if a trust existed, but it is by no means clear that the agreement or compact between the Government and the State of Indiana, as declared by the act of admission, amplified by the Act 1S57, constituted a trust which would take the claim out of the operation of the statute of limitations within the intent of the leading case of Kane v. Bloodgood (7 Johns. Ch. R., 69) and the case most relied upon, Irene Taylor (104 U. S. R., 216).
The money termed a trust fund was not money of the State of Indiana confided to the Government for a-purpose, nor was it money of a third person paid to the Goverment for the use and benefit of the State. On the contrary, the 2 per cent fund was always the money of the Government, derived from the sale of its own property, and the statute creating the fund was in terms but an agreement that the Government should expend a designated, though indeterminate, amount of its own money in the construction of a public work more or less beneficial to the other party.
The State of Indiana never had an exclusive interest in the fund or in the work which was the purpose and object of the trust. Theroad to be constructed — the road “leadingtothesaid State” — would not lie within its territory; the State would not be entitled to rents, issues, or profits therefrom; the utmost legal interest which could be possessed in the thing itself was a right of free transit for its citizens and agents; a right which would be shared by all the world. If the purposes of the trust had been fully carried out, and a road had been completed from Baltimore to Indiana, according to the extremest view of the obligation resting on the Government, the State as a body corporate would not have had therein the shadow of a property right. The trust has been ascribed to the Act 1S57, but an agreement to pay money does not make the amount specified the money of the other party, and a gift of money, though by statute, does not pass a property in it till the money be paid. In the case of Mrs. Taylor (supra) the realty which was sold was her property, and the surplus which was in the Treasury was her money, and the statutory declaration that the Government *617 would bold it until demanded by tbe owner necessarily created a trust.
In speaking of tbe Act 1841, and tbe course pursued by Congress in relation to tbe States of Alabama and Mississippi, tbe court bas spoken in tbis opinion upon tbe assumption that tbe condition of tbe 2 per .cent fund in those States was substantially tbe same as that of “tbe other States” referred to in tbe Act 1857. The argument pressed upon tbe court was that tbe public land laws are to be read in pari materia; that it bas never been tbe policy of Congress to grant exceptional favors to single States and deny them to others in like circumstances; that by tbe Act 1841 there was inaugurated a policy of restitution, and by tbe Act 1857 tbis policy was extended to all “ tbe other States ” which in like manner bad been entitled to tbe percentage of the public land sales erroneously or improperly expended on an unfinished road; and that (tupon the same principles” which governed tbe restitution of tbe fund to Alabama and Mississippi, it must be restored to tbe other States. But as a matter of fact tbe cases are not parallel, and “the same principles” which govern tbe payments to Alabama and Mississippi are fatal to a recovery in this suit. Tbe difference between tbe two classes of States is that the fund of Alabama and Mississippi was never expended on their behalf, and no appropriations were ever made chargeable against it. Tbe payment under tbe Act 1841 was payment for tbe first time. They were then entitled to have tbe fund expended ; not to expend it themselves, but to have it expended; their right to that was unquestioned, for Congress had never assumed to expend it, or made an expenditure chargeable against it. Tbe acts 1841, 1855,- 1857 repealed no statute by implication, and did nothing more than carry out for the first time tbe obligation assumed by the General Government when the two States were admitted to the Union, and no principle embodied in those statutes by any possible construction would compel tbe Government to pay or expend for those States tbe 2 per cent fund a second time. By tbe fact that tbe Government bad expended nothing on their behalf when tbe acts 1841, 1855, 1857 were passecl tbe analogy between them and “ tbe other States ” is destroyed.
Tbe judgment of tbe court is that tbe petition be dismissed.